David L. LUCAS, Appellant,

v.

**ANCHORAGE POLICE & FIRE RETIREMENT BOARD,**
Appellee.

No. S–6731.

Supreme Court of Alaska.

July 10, 1998.

James A. Gasper, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant.

Frank S. Koziol, Law Office of Frank S. Koziol, Anchorage, for Appellee.

Before RABINOWITZ, MATTHEWS, COMPTON, EASTAUGH and BRYNER, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION.

In 1988 David Lucas, a former Anchorage policeman, was awarded non-occupational disability benefits from the time of his discharge in 1982. In 1993 the Police & Fire Retirement Board terminated Lucas's benefits on the ground that he was no longer

---

1. When necessary to provide context, we adopt the parties' practice of referring to the Board which granted Lucas benefits as "Board I," and to the Board which terminated his benefits as "Board II."

disabled. Lucas appeals from the Board's termination of benefits decision.

### II. FACTS AND PROCEEDINGS

David Lucas was hired by the Anchorage Police Department (APD) in April 1977. He was discharged for misconduct in December 1982. The discharge was prompted by an incident in which he beat a handcuffed prisoner and later falsified a police report which caused unwarranted charges to be filed against the victim of the beating.

On the day he was discharged, Lucas filed a claim for permanent occupational disability benefits. The Anchorage Police & Fire Retirement Board denied this claim. Before a formal hearing on this claim, Lucas also filed a non-occupational disability claim.

In his non-occupational disability claim, Lucas asserted that he was psychologically unable to control outbursts of anger, and was therefore disabled from performing the duties of a police officer. The experts who examined Lucas concluded that even prior to his hiring by APD, he possessed psychological problems that made him unsuitable for police work. This posed a problem for Lucas, because an employee is only eligible for benefits if he or she was employed for at least "five years ... prior to the date of disability." AMC 3.85.130C. The Board's staff (Staff) opposed Lucas's claim by arguing that he was disabled when he came to work for APD, and thus had not served the required five-year pre-disability term. Lucas argued that he had completed five years of pre-disability service, and did not become incapable of performing his duties until December 1, 1982, when the incidents leading to his termination took place.

In January 1988 the Board (Board I)[1] issued findings of fact and conclusions of law. Board I concluded that Lucas was unsuitable for police work at the time of his hiring, but that he had not become disabled from work until December 1982. Board I found that non-occupational stressors,[2] in combination

---

2. Board I's opinion does not describe the factors which caused Lucas's pre-existing mental condition to deteriorate into a disability. But as the Board notes in its brief, because Lucas was awarded non-occupational disability benefits, the

with the mental condition that predated Lucas's APD employment, made him subject to "sudden, uncontrollable temper outburst[s] wherein Mr. Lucas lost control of his actions and was unaware of what he was doing." More particularly, Board I wrote:

> The Board finds that the date of Mr. Lucas' disability was December 1, 1982. While Mr. Lucas did suffer from a mental condition [i.e., the personality disorder] which predated his employment with the Anchorage Police Department, and rendered him unsuitable for police work, that pre-existing mental condition did not render him "unable to perform his assigned duties" [i.e., disabled] pursuant to Anchorage Municipal Code 3.85.130 A., until December 1, 1982, when his conduct precipitated his termination. The violent aspect of that conduct was the result of a sudden, uncontrollable temper outburst wherein Mr. Lucas lost control of his actions and was unaware of what he was doing.

Board I granted Lucas non-occupational disability benefits retroactive to the time of his discharge in 1982.

The Anchorage Municipal Code formerly provided that non-occupational disability "shall continue for life or until the member is capable of resuming duties with any police or fire department."[3] Former AMC 3.85.130A (1993). The code also provides that:

> The retirement board shall review the status of the physical and mental condition of all persons receiving disability benefits on an annual basis or at more frequent intervals if determined necessary by the board. If the board determines that a physical or mental condition is the type of condition which could improve, the board may require the member to submit to additional

physical or mental examinations at the expense of the system.
AMC 3.85.045.

In 1989 Lucas was examined by Dr. Blum, a psychologist. Dr. Blum concluded that Lucas was not currently disabled, and noted his disagreement with Board I's determination that Lucas had been disabled at the time of the incident which precipitated his discharge. A subcommittee of the Board, however, recommended that Lucas continue on disability benefits, since Dr. Blum's recommendations were similar to those presented to and rejected by Board I during the previous year's hearing.

In 1991 the Board sent Lucas a questionnaire explaining that it needed information in order to carry out its "responsib[ility] for annually reviewing the status of members receiving disability benefits to determine their continued eligibility for those benefits." In response to a query as to his "current condition," Lucas responded "EXCELLENT." Lucas further responded negatively to a query as to whether he was "under a physician's care for treatment of [his] stress problem."

When the Board staff received the completed questionnaire, it recommended that "as Mr. Lucas states his current condition is excellent," the Board should have Lucas undergo testing to "evaluate his current psychological condition." In February 1992 the Board ordered an examination by Dr. Raffle, a psychiatrist.

Dr. Raffle concluded that although Lucas possessed a personality disorder that made him unsuitable for police work, he was not disabled.[4] Dr. Raffle also disagreed with Board I's earlier findings regarding Lucas's psychological condition: while he allowed

---

cause of his disability must have been non-occupational rather than work-related. Lucas acknowledges this in his brief.

3. The current version of AMC 3.85.130 provides that nonoccupational disability "shall continue for life or until the member has recovered from the disability for which benefits are paid or is physically and mentally capable of performing duties similar to those performed upon retirement." AMC 3.85.130A.

4. Dr. Raffle concluded that the non-occupational stressors that had earlier made Lucas's condition acute were arguments with his wife over corporal punishment of his children, the recent birth of a child, and a severe chronic illness in his two-year-old son which made the boy incontinent. He later testified before Board II that Lucas had come to terms with some of these issues and others had abated, and that Lucas had demonstrated a consequent ability to control his temper in work situations and at home.

that "a temporary aggravation of [Lucas's] personality disorder occurred during his employment due to non-employment stressors," he did not agree that Lucas's condition had ever been so severe as to amount to a disability.

Based on the medical reports, the Board Staff concluded that Lucas was no longer disabled. A hearing was convened before Board II in April 1993.

Drs. Raffle and Blum testified, each concluding that Lucas was not currently disabled. Both doctors also concluded, contrary to Board I's findings, that Lucas had never been disabled. Although Lucas's attorney cross-examined both doctors at the Board II hearing, Lucas did not attend the hearing and called no witnesses. His counsel argued that the mental condition that Board I deemed to be the cause of disability was a chronic personality disorder which predated his employment, that he retained this disorder, and that consequently, Board II could not find that he was no longer disabled. Lucas's attorney also argued that although his mental condition had improved, if he returned to police work he would again experience uncontrollable anger that would render him incapable of performing his duties.

In May 1993 Board II decided that Lucas was capable of performing the usual duties of a police officer and was therefore no longer disabled. In its decision Board II stated:

8. The Board finds that in and around December of 1982 Mr. Lucas suffered from non-occupational stressors which either aggravated his chronic personality disorder rendering him unable to perform [his] duties . . . or caused an acute disorder rendering him unable to perform [his] duties. . . .

. . . .

10. The Board finds that Mr. Lucas' acute disorder or the aggravation of his chronic personality disorder which rendered him disabled in 1982 has improved or resolved. The Board relies upon Dr. Raffle's testimony and evidence of Mr. Lucas' current ability to control his behavior.

11. The Board finds that Mr. Lucas's current mental condition is, more likely than not, improved over what it was during his first five years of employment with the police department. . . .

12. The Board finds and concludes that Mr. Lucas is currently able to perform the assigned or normal duties of a police officer.

13. The Board finds and concludes that Mr. Lucas is no longer disabled.

14. The Board finds and concludes that Mr. Lucas is no longer entitled to receive permanent non-occupational disability benefits.

Lucas appealed to the superior court which affirmed the decision entered by Board II. Lucas now appeals to this court.

## III. DISCUSSION

### A. The Board May Periodically Examine Benefit Recipients to Ensure That Their Disability Continues.

 Lucas argues that the Anchorage Municipal Code "does not permit the Board to conduct a new inquiry through periodic examinations of a benefit recipient to determine if the original finding of disability has disappeared over time." From this premise, Lucas argues that the examinations undertaken by Drs. Blum and Raffle, as well as the Board II proceeding, were an illegitimate exercise of administrative power, and that his benefits must therefore be reinstated.[5]

---

5. "In the typical administrative appeal based only on an agency record, we give no deference to the decision of the superior court and independently scrutinize the administrative action." *Fairbanks N. Star Borough Sch. Dist. v. Bowers Office Prods., Inc.*, 851 P.2d 56, 58 (Alaska 1993) (citing *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)). Resolving the first issue in this case requires interpreting the Anchorage Municipal Code provisions which constitute the Board's authorizing legislation. We employ the "reasonable basis" test for questions of law where agency expertise is involved. *See Underwater Constr., Inc. v. Shirley*, 884 P.2d 150, 152 (Alaska 1994). We employ the "substitution of judgment" test for questions of law where no agency expertise is involved. *See id.* Where, as here, "the sole issue concerns a question of statutory interpretation," the substitution of judgment standard applies. *Id.*

Lucas bases his argument on a reading of AMC 3.85.045, which, as noted above, provides:

The retirement board shall review the status of the physical and mental condition of all persons receiving disability benefits on an annual basis or at more frequent intervals if determined necessary by the board. If the board determines that a physical or mental condition is the type of condition which could improve, the board may require the member to submit to additional physical or mental examinations at the expense of the system.

AMC 3.85.045. Lucas interprets this ordinance as follows:

it is presumed under the ordinance that [a permanent disability] can only be cured through Board-ordered therapy, and after a finding that such therapy would improve the condition. AMC 3.85.045 limits the Board to determining through medical examination if the benefit recipient has a condition which *could improve*. The clear implication is that the Board may only order remedial therapy to assist in rehabilitation of the disability benefit recipient, [and] therefore its inquiry must focus upon whether the benefit recipient has a condition which could be remediated by therapeutical treatment. [The ordinance] does not empower the Board to revisit original findings of permanent disability.

We view the Board's interpretation of AMC 3.85.045 as more plausible. The first step in the Board's interpretation is recognizing that although Board I found Lucas's disability to be "permanent," this did not amount to a finding that Lucas would literally be disabled forever. Both litigants agree that "permanent" is a term of art, and under the municipal code a "permanent non-occupational disability" is one which "continue[s] for life *or until the member is capable of resuming duties with any police or fire department.*" Former AMC 3.85.130A (1993) (emphasis added). The Board interprets AMC 3.85.045 as an instruction that it should ensure that those persons receiving disability

benefits continue to meet the definition of disabled found in AMC 3.85.130A. In the Board's view, the two provisions are read in conjunction as follows: under AMC 3.85.045, it reviews the condition of benefit recipients, and directs recipients to undergo examinations if their condition is "the type . . . which could improve"; if a recipient's condition improves to the point that s/he is "capable of resuming [his or her] duties," then under AMC 3.85.130A that person is no longer disabled, and the Board will terminate benefits.

We believe that the Board's interpretation of these code provisions is correct, and reject Lucas's reading of the ordinance. Lucas offers no legal support, and we see no logical support, for his claim that a presumption exists under AMC 3.85.045 that permanent disabilities can only be cured through Board-ordered therapy, and that the Board cannot revisit findings of disability based on changed circumstances.

Municipal Code 3.85.045 does not provide that the Board can only require an examination if a beneficiary's condition is "curable," or "amenable to treatment." Rather, it states that the Board may order an examination if it determines that a beneficiary's condition "could improve." AMC 3.85.045. Having determined through Lucas's response to the questionnaire that Lucas's condition was apparently "excellent," the Board ordered him to submit to an examination. This administrative action comports with the plain language of the ordinance. After the examination indicated that Lucas no longer met the definition of disabled, Board II held a hearing on the matter and terminated Lucas's benefits. This action comports with the directive in AMC 3.85.130A regarding which former employees may lawfully receive disability benefits. In sum, Board II's actions were consistent with, and indeed required by, the municipal code.

Another indication of the weakness of Lucas's argument is that his interpretation of the code would lead to absurd results: a recipient's condition might completely improve,[6] but AMC 3.85.045 would require dis-

---

6. As the Board notes, Lucas's interpretation of the municipal code is apparently driven by his belief that it is "fatuous to contend that [his own

condition] has improved over the mere passage of time"—i.e., without the benefit of psycho-therapy. Thus, in order to demonstrate that his own,

ability benefits to continue until (1) the Board found that the (now non-existent) condition "could improve"; and (2) the Board ordered a course of therapy for the (non-existent) condition, until some point at which Lucas's "presumption" was satisfied.

### B. Board II's Decision Did Not Violate Principles of Collateral Estoppel.

 Lucas argues that Board II's termination of his benefits violated the doctrine of collateral estoppel.[7] This doctrine, which applies to administrative agencies, see Holmberg v. State, 796 P.2d 823, 827 (Alaska 1990), prohibits the relitigation of issues which have already been decided by a final judgment. See Rapoport v. Tesoro Alaska Petroleum Co., 794 P.2d 949, 952 (Alaska 1990). Lucas cites a Washington case holding that under the doctrine of collateral estoppel, a final award of disability benefits cannot be canceled simply as a result of an administrative change of heart; only if there has been a "change in circumstances" can benefits be discontinued. See Malland v. State, Dep't of Retirement Sys., 103 Wash.2d 484, 694 P.2d 16 (1985). Having laid this legal foundation, Lucas contends that Board II's decision amounts to an impermissible rejection of Board I's determination that he was non-occupationally disabled.

The Board agrees that the doctrine of collateral estoppel requires that a change in circumstance must be shown if disability benefits are to be terminated. It takes issue, however, with Lucas's claim that Board II improperly reversed the findings of Board I. The Board contends that Board II in no way disagreed with or altered Board I's conclusions; it notes that, in fact, Board II explicit-

ly affirmed Board I's decision. The Board further observes that, rather than contradicting Board I's findings concerning the state of Lucas's mental health from 1982 to 1988, Board II simply found that Lucas was no longer disabled as of April 1993, and therefore terminated Lucas's benefits.

In arguing that Board II allowed an impermissible relitigation of the issues already decided by Board I, Lucas primarily relies on the fact that Drs. Raffle and Blum told Board II that they disagreed with Board I's finding that Lucas was disabled as of December 1982. It is true that these expert witnesses criticized Board I's decision. But as the Board notes, while this testimony might have been cause for evidentiary objection at the hearing, it does not give rise to a collateral estoppel problem.

Board II was convened to determine whether Lucas remained disabled. The fact that Drs. Raffle and Blum gave testimony regarding a non-issue (whether Lucas had really been disabled in 1982) would have been ground for a relevancy objection, but Lucas voiced no such objection. Moreover, Lucas might have argued that since Drs. Raffle and Blum disagreed with Board I's conclusions regarding Lucas's mental health from 1982 to 1988, their opinions regarding his mental health in 1992 deserved little weight. But it was ultimately up to the Board, as fact finder, to make decisions concerning the weight of the evidence.

Contrary to Lucas's focus on a portion of the testimony of Drs. Raffle and Blum, we must examine what Board II actually decided to determine whether Board II violated prin-

---

untreated, disability continues as a matter of law, Lucas purports to find in AMC 3.85.045 a "presumption" that only through therapy can a disability improve. But it is not fatuous to assert that Lucas's condition has improved "over the mere passage of time" to the point where he is no longer disabled. Board I found that although Lucas was unsuited for police work from the date of his hire, he was able to work for a number of years until non-occupational stressors elevated his personality disorder into a disability. Board II found that because the non-occupational stressors which had triggered Lucas's violent reactions to stressful situations had abated and/or been dealt with by Lucas, his psychological condition was the same as or better than it

was during the first years of his APD employment, when he was capable of performing his duties. This account of improvement without therapy is certainly plausible; indeed, as discussed in Part III.C, infra, it is supported by substantial evidence in the form of expert testimony.

7. Whether Board II's decision improperly revisited issues previously resolved by Board I is a question of law which involves no agency expertise. We therefore apply the substitution of judgment standard. See Underwater Constr., 884 P.2d at 152.

ciples of collateral estoppel. Board II's findings indicate that it rejected the doctors' criticism of Board I's conclusion, but accepted their conclusions regarding Lucas's current condition. This evidences no violation of collateral estoppel, and we therefore reject Lucas's argument.

### C. Board II's Decision to Terminate Lucas's Benefits Was Supported by Substantial Evidence.

 Lucas argues that once an administrative board has determined that an individual is disabled, there should be a presumption "of a continuing disability in the face of strong evidence to the contrary." He argues that Board II ignored such a presumption, and that its decision was not supported by substantial evidence.[8] We find his argument unpersuasive.[9]

The section of Lucas's brief concerning the adequacy of the evidence consists mainly of a recapitulation of his arguments concerning the meaning of AMC 3.85.045 and the alleged violation of the collateral estoppel doctrine. His only real argument regarding the sufficiency of the evidence is a claim that Drs. Raffle and Blum engaged in "semantical sophistry" when they claimed that Lucas was "unsuitable" for police work yet "capable," of it. Lucas argues that this is "disingenuous, and devoid of common sense." In his view, since Drs. Raffle and Blum agree with the experts who testified before Board I that Lucas is unsuited for police work, it must logically follow that he remains incapable of performing it, and thus disabled. Thus, he considers Board II's decision unsupported by substantial evidence.

Contrary to Lucas's argument, Board I accepted the proposition that Lucas could be "unsuitable" for police work, yet capable of performing the duties of an officer. In fact, despite general agreement of the expert witnesses before Board I that Lucas was unsuitable for police work from the date of his hiring, Lucas urged that Board to find that he put in five years of capable service before his disability struck and he became unable to perform such work.[10]

In sum, both the "law of the case" as established by Board I and Lucas's own arguments before that Board indicate that it is neither "disingenuous" nor "devoid of common sense" to conclude that although someone with a chronic personality disorder is not well suited for work as a policeman, he is nevertheless capable of performing the job. Lucas's only argument regarding the sufficiency of the evidence is therefore meritless.

As described above, Board II's conclusion that Lucas was no longer disabled was based on the uncontested testimony of two expert witnesses. Based on their evaluations of Lucas, and on Lucas's statements to them in interviews, Drs. Blum and Raffle concluded that Lucas demonstrated an ability to control his temper in stressful situations, and would be able to perform the duties of a police officer. This testimony constitutes substantial evidence supporting Board II's decision.

## IV. CONCLUSION

Board II acted within its powers by holding a hearing to determine whether Lucas

---

**8.** Whether the Board correctly concluded that Lucas is able to perform the duties of a police officer and is therefore no longer disabled is a question of fact. This court employs the "substantial evidence" test when questions of fact are presented in an administrative appeal. *See Municipality of Anchorage, Police & Fire Retirement Bd. v. Coffey*, 893 P.2d 722, 726 (Alaska 1995). Under this standard, "the court does not independently reweigh the evidence .... [or] choose between competing inferences." *Id.* Rather, it determines "whether there is substantial evidence, in light of the whole record, such that a reasonable mind might accept the [agency] decision." *Id.* (citations omitted).

**9.** We do not address Lucas's argument regarding the presumption of continuing disability, because even if Lucas is correct, Board II's decision should be affirmed. That is, even if the Board were required to find that Lucas was not disabled by "clear and convincing evidence" (rather than by a preponderance of the evidence), we would conclude that it met that burden here, where uncontested expert testimony supported Board II's conclusion.

**10.** As discussed, it was only through this argument that Lucas was able to demonstrate his eligibility to receive benefits. *See* AMC 3.85.130C (requiring five years of pre-disability employment before employee may participate in benefits program).

remained eligible to receive disability benefits. Since Board II's decision did not reverse or contradict the findings of Board I, there was no violation of the doctrine of collateral estoppel. Finally, Board II's decision terminating Lucas's non-occupational benefits is supported by substantial evidence.

AFFIRMED.

MATTHEWS, J., with whom COMPTON, J., joins, dissent.

MOORE*, C.J., not participating.

MATTHEWS, Justice, with whom COMPTON, Justice, joins, dissenting.

The purpose of periodic review of disability status is to determine whether a member who was previously found to be disabled is now capable of working as a police officer. This is a practical standard. If a member can go back to work as a police officer, he should not continue to receive disability payments. The board must answer whether a member is now employable as a police officer either because of improvement in the member's mental or physical condition which originally led to his disability rating, or because of new standards used by police departments.

In this case there is no evidence that Lucas's personality disorder, which was found to be disabling by Board I, has changed in any important way. Likewise, there is no indication that police departments now use different standards which would enable Lucas to perform work as a police officer. He is therefore now no more capable of serving as a police officer than he was in 1982. Because of his personality disorder which was previously found to be disabling, Lucas cannot find employment as a police officer and no one seriously contends otherwise.

The explanation for Board II's decision in this case is that the two doctors on whom Board II relied made a distinction between unsuitability for police work and incapacity for police work. They believe that Board I made a mistake in determining that Lucas's personality disorder made him *incapable* of performing police work. In their view, his personality disorder merely made him *unsuitable* for police work.

I do not think that it is important to debate whether there is a substantive distinction between unsuitability for police work caused by a personality disorder and incapacity for police work caused by the same personality disorder. Board I found that Lucas's personality disorder constituted a disability which made him "unable to perform his assigned duties." In order to terminate disability payments, Board II must determine that there has been a significant change in this personality disorder—or a change in police standards—which makes Lucas now capable of doing police work. Since no substantial evidence supports either change, Board II's determination must be reversed.

* Subsequent to the oral argument in this case, Chief Justice Moore retired and did not partici- pate in this decision.