Anthony J. WESCOTT, Appellant,

v.

STATE of Alaska, DEPARTMENT OF LABOR, Appellee.

No. S–8688.

Supreme Court of Alaska.

Feb. 18, 2000.

Randall E. Farleigh, Farleigh & Shamburek, Anchorage, for Appellant.

Toby N. Steinberger, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

I. *INTRODUCTION*

Anthony Wescott quit his roustabout job at Alaska Petroleum Contractors, Inc., (APC) because he believed that APC was unwilling to accommodate his disability, bilateral club feet. He applied for unemployment pay, but the Department of Labor denied him waiting-week benefits, finding that he had quit suitable work without good cause. Under AS 23.20.385(b), when the department decides questions of work suitability it must consider not just the claimant's physical ability to perform the work but also the degree of risk that the work would pose to the claimant's health. In deciding that Wescott's work was suitable, the department emphasized a medical release, which indicated that

he was physically capable of doing roustabout work; but the department overlooked other medical evidence suggesting that the "wear and tear" of such work might pose a risk to Wescott's club feet. Because the department did not adequately consider risk to Wescott's health as a factor in determining that his work was suitable, we remand for reconsideration.

## II. FACTS AND PROCEEDINGS

Wescott began working for APC in June 1996, starting as a well service technician and eventually moving into a drilling roustabout position. As a drilling roustabout, Wescott had many duties, including cleaning tanks, helping in drilling rig moves from one drill site to another, and assisting in rigging trees on-line. Despite being born with club feet, Wescott had worked as a roustabout in Prudhoe Bay for over ten years.

On November 28, 1996, Wescott took medical leave to have surgery on one of his feet—one in a series of operations he had throughout his lifetime. Soon after Wescott took leave, and before his surgery, orthopedic surgeon Dr. Ron Brockman examined him at the request of the Alaska Division of Vocational Rehabilitation. In a report dated December 10, 1996, Dr. Brockman predicted, "This gentleman is going to have difficult problems with his feet. I recommend that he tr[y] to get into an area of employment that is less physically demanding [than that of a roustabout] and which requires less standing and walking time." Dr. Brockman also commented that Wescott would "certainly be capable of performing the duties of a heavy-equipment operator."

After the operation, Dr. Bret Mason, Wescott's treating physician, made a similar recommendation. Although Dr. Mason reported on January 16, 1997, that Wescott was "healing nicely" and would be able to return to work in three or four weeks, the doctor also warned, "In my opinion, the patient would benefit by pursuing a job opportunity that does not require prolonged standing, prolonged walking, especially on hard surfaces." Noting that Wescott had experience in equipment operation, Dr. Mason recommended that "it would be in his best interest to

pursue and develop his aptitude in this area.... With the wear and tear and degenerative condition I found in his left foot, I think this would give him the best chance of good longevity as a part of the work force."

On February 6, Dr. Mason signed a release authorizing Wescott to return to his roustabout job without restriction as of February 28. The next day, February 7, Wescott gave APC a note informing the company of the release and requesting a position "[t]hat is not so demanding on my DISABLED CLUB FEET." He enclosed a resume indicating that he had experience as a heavy-duty equipment operator, and a letter from Dr. Mason explaining the disability (evidently a copy of Dr. Mason's January 16 report).

APC Human Resources Office employees Christopher Boyle and Carolyn Swangler met with Wescott that same day to discuss his request. They offered him the option of returning to his roustabout job while waiting for a less demanding permanent position to open. They also gave Wescott ergonomic assessment forms for five different positions—roustabout, fire watch, well service technician, vac truck operator, and equipment operator—explaining that he needed to complete the forms and return them so that APC could assess whether, given his medical condition, he would be able to perform in these positions.

Wescott opted to return to work as a roustabout the next month. On March 6— nine weeks after the surgery—he obtained from Dr. Mason another release, which confirmed his ability to return to his roustabout job without restriction. In his nine-week postoperative report Dr. Mason wrote, "The patient feels that he is able to return to his original job position with absolutely no problems. Therefore, today, I am going to release him to return to work full duties, no restrictions." Dr. Mason nonetheless adhered to his earlier view that roustabout work could be detrimental to Wescott's condition; in his report the doctor emphasized that even though Wescott felt that roustabout work was "well within his capabilities" and wanted to return to his old job, "it would be in [Wescott's] best interest to pursue

more of a position that did not require standing so long, ambulating on hard or uneven surfaces, etc."

After Wescott met again with Swangler in APC's Anchorage office and gave her the March 6 medical release, Swangler indicated that APC would allow Wescott to return to a drilling roustabout position. But Swangler and Wescott also discussed the availability of less demanding positions. Swangler indicated that various positions were open on a temporary basis but that their availability to Wescott remained uncertain because he had not returned the completed assessment forms. But since the available positions were only temporary, Wescott told Swangler that he would reject them in any event.

Wescott resumed work with APC on March 11 or 12, 1997. Upon his return to Prudhoe Bay, APC certified him to work as a tractor-trailer operator and to handle loaders and forklifts. Soon after his return, however, Wescott heard that one of his supervisors, Rick Nelson, had recently filled four heavy-equipment operator positions and that Nelson had no intention of ever giving Wescott such a position. Although Wescott did not confirm this information or ascertain whether the four positions had been filled before his return, he did ask Nelson about the possibility of a job change. According to Wescott, Nelson responded that he "wasn't going to play any favorites."

On April 22, 1997, while in Anchorage between shifts at Prudhoe Bay, Wescott called Swangler to say that he did not know how much longer he could tolerate the pain in his current position and that he feared further damage to his feet. Complaining that Nelson was acting "unprofessionally" in his hiring practices, Wescott requested an immediate transfer. Since Wescott was scheduled to return to work the next day, Swangler suggested that he talk to Russell Pittman, another APC supervisor at Prudhoe Bay, and she tried to arrange a meeting. But Wescott

did not pursue this suggestion. Instead, he stayed in Anchorage and submitted his resignation.

After resigning, Wescott applied to the Department of Labor, Division of Employment Security, for unemployment benefits under the Alaska Employment Security Act.[1] The division notified Wescott that under AS 23.20.379 and 8 Alaska Administrative Code (AAC) 85.095 he was disqualified from receiving benefits for his first six weeks of unemployment—"waiting week" benefits—because he had voluntarily left suitable work without good cause. Wescott appealed to the division's appeal tribunal. The tribunal held an evidentiary hearing and affirmed the division's decision. Wescott then appealed to the commissioner of labor, who affirmed the appeal tribunal's decision, adopting its findings. The superior court heard Wescott's next appeal and affirmed the commissioner's ruling. Wescott now appeals the superior court's decision.

### III. DISCUSSION

#### A. Standard of Review

■ When the superior court acts as an intermediate court of appeal, we independently review the merits of the administrative determination.[2] Unless the case calls for reliance on agency expertise, we apply the "substitution of judgment" test to review questions of law[3] and the "substantial evidence" test to review questions of fact.[4]

#### B. Overview of Applicable Law

Alaska Statute 23.20.379(a) denies "waiting week credit or benefits" for six weeks if a worker leaves suitable work without good cause:

An insured worker is disqualified for waiting-week credit or benefits for the first week in which the insured worker is unemployed and for the next five weeks of un-

---

1. AS 23.20.005–23.20.535.

2. See *Faulk v. Board of Equalization*, 934 P.2d 750, 751 n. 2 (Alaska 1997).

3. See *State, Dep't of Revenue v. OSG Bulk Ships, Inc.*, 961 P.2d 399, 403 n. 6 (Alaska 1998).

4. See *Municipality of Anchorage, Police & Fire Retirement Bd. v. Coffey*, 893 P.2d 722, 726 (Alaska 1995).

employment following that week if the insured worker

(1) left the insured worker's last suitable work voluntarily without good cause....

8 AAC 85.095(a) similarly provides that "[a] disqualification under AS 23.20.379(a) ... remains in effect for six consecutive weeks...."

In discussing this provision, the department's policy manual [5] construes "suitable work" to mean "the worker's usual occupation or work for which the worker is reasonably fitted by training, experience, and physical condition." [6] But when a worker suffers from a disability, being physically capable of performing a job does not necessarily mean that the worker has suitable work. Under the policy manual, even though a worker is able to perform certain work, that work may be unsuitable if it has a detrimental effect on the worker's condition: "If accepting work is detrimental to the claimant's health, *or* if the claimant's health or physical condition prevent[s] the claimant's performing the work, there is no issue [under the waiting-week disqualification] statute." [7]

When an existing health problem is obvious, the worker need not present medical evidence to establish its existence. In other cases, the department ordinarily requires the worker to submit a physician's statement. [8]

The department interprets the suitable-work requirement of AS 23.20.379(a) to deny work-week benefits upon proof that a worker left suitable work and that the departure was without good cause. [9] Under this interpretation, then, a worker needs good cause only to quit suitable work; the worker always remains free to quit unsuitable work. "There is no disqualification if a worker leaves unsuitable work." [10]

In contrast, once suitable work is found to exist, the "good cause" rule applies to the case. The department defines "good cause" for leaving suitable work by reference to an objective, reasonably prudent person standard:

Good cause for voluntarily leaving work under AS 23.20.379(a)(1) includes

(1) leaving work for reasons that would compel a reasonable and prudent person of normal sensitivity, exercising ordinary common sense, to leave work; the reasons must be of such gravity that the individual has no reasonable alternative but to leave work[.] [11]

When a worker quits because of health or a physical condition, the department will find good cause if four conditions are met: "[ (1) t]he conditions of work materially and adversely affect the physical condition of the worker; [ (2) t]he worker's physical condition compels the leaving; [ (3) t]he worker has no reasonable alternative; *and* [ (4) t]he worker attempts to preserve the employment relationship." [12] If a worker quits on the advice

5. The Department of Labor maintains a precedent manual interpreting the provisions of AS 23.20 in accordance with 8 AAC 85.360. *See* Alaska Department of Labor, Employment Security Division, Precedent Manual [hereinafter Precedent Manual]. Since the department periodically revises and updates the Precedent Manual, some of the current provisions that relate to Wescott's case differ slightly from corresponding provisions in effect when the department and the superior court considered Wescott's case and when the parties filed their briefs. We have chosen to rely on the current Precedent Manual in this opinion because none of its relevant provisions reflect substantive changes to earlier versions.

6. Precedent Manual at VL 5–3 (Oct.1999).

7. *Id.* at SW 235.05–1 (July 1999) (emphasis added).

8. *See id.* at SW 235.05–2 (July 1999).

9. The Precedent Manual at VL 5–1 provides in part:

The provisions of AS 23.20.379(a)(1) apply only in relation to the worker's *last work.* It is necessary to determine:
• Did the worker voluntarily *leave work?*
• Was the work *suitable?* and
• Did the worker have *good cause* for leaving?
Precedent Manual at VL 5–1 (June 1999).

10. *Id.* at VL 5–3 (Oct.1999).

11. 8 AAC 85.095(c); *see also* Precedent Manual at VL 5–3 (Oct.1999) ("[1] The underlying reason for leaving work must be compelling; and[] [2] [t]he worker must exhaust all reasonable alternatives before leaving the work.").

12. Precedent Manual at VL 235.05–1 (Oct.1999) (citations omitted) (emphasis added). Under the good cause requirement, conditions that have an "adverse affect" on a worker can be "established

of a physician, the department normally finds good cause.[13]

Alaska Statute 23.20.385(b) requires the department to consider various factors when it determines whether a worker left "suitable work" and whether "good cause" exists, chief among them being "the degree of risk to the claimant's health [and] safety . . . [and] the claimant's physical fitness for the work." [14] The worker bears the burden of establishing a lack of suitable work or the existence of good cause for a voluntary termination.[15] The statutory scheme applies an objective standard, encompassing any factor "that [would] influence a reasonably prudent person in the claimant's circumstances." [16]

### C. The Appeal Tribunal and the Commissioner Erred in Determining that Wescott's Job as a Roustabout Was Suitable Work.

■ The hearing officer for the Employment Security Division Appeal Tribunal found that Wescott's roustabout job was suitable work. In entering this finding, the hearing officer relied almost exclusively on Wescott's medical release, which established his physical ability to perform roustabout work:

In light of Mr. Wescott's full medical release, without restrictions, the roustabout position was medically suitable for Mr. Wescott. The doctor's suggestion that Mr. Wescott pursue other work in the future, absent specific advice for him to quit work or immediately change occupations, failed

to show that the roustabout job was unsuitable.

Wescott challenges this finding, arguing that the hearing officer failed to consider all of the relevant factors listed in AS 23.20.385(b). Specifically, Wescott observes that in focusing on the medical release that authorized him to return to roustabout work, the hearing officer considered only one statutory factor—"physical fitness"—and neglected to consider a second significant factor, "the degree of risk to the claimant's health [and] safety." [17] Wescott argues that the hearing officer erred in finding that his physician's willingness to release him to work as a roustabout established that this work was suitable. Wescott points out that his physician also advised that it would be best for him to find a different job. This advice, Wescott contends, indicates that roustabout work was unsuitable. Wescott's argument is persuasive.

■ As we have already pointed out above, physical ability does not necessarily establish work-suitability in the case of a worker with an existing health problem since—according to the department's policy manual—"[i]f accepting work is detrimental to the claimant's health, or if the claimant's health or physical condition prevent the claimant's performing the work, *there is no issue under [the waiting-week disqualification] statute*." [18] "Suitability" is thus an inquiry that encompasses more than short-term physical capability. A claimant may be "capable" of performing a particular job and

only if the conditions of work actually impair the worker's health, or the worker has a reasonably-founded belief that the conditions impair the worker's health, or the worker's physical condition prevents the worker from performing the work." *Id.* (bullets omitted).

**13.** But the lack of a medical recommendation is not dispositive "if other facts show that continued employment was dangerous to the worker's health or physical condition, and the worker made a reasonable effort to obtain an adjustment of the work situation before quitting." *Id.* at VL 235.05–3 (June 1999) (citation omitted).

**14.** AS 23.20.385(b) provides:

In determining whether work is suitable for a claimant and in determining the existence of good cause for leaving or refusing work, the department shall . . . consider the degree of risk to the claimant's health, safety, and mor-

als, the claimant's physical fitness for the work, the claimant's prior training, experience, and earnings, the length of the claimant's unemployment, the prospects for obtaining work at the claimant's highest skill, the distance of the available work from the claimant's residence, the prospects for obtaining local work, and other factors that influence a reasonably prudent person in the claimant's circumstances.

**15.** *See Reedy v. M.H. King Co.,* 128 Idaho 896, 920 P.2d 915, 918 (1996).

**16.** AS 23.20.385(b).

**17.** AS 23.20.385(b); *see supra* note 14.

**18.** Precedent Manual at SW 235.05–1 (July 1999) (emphasis added).

yet be "unsuited" for it. As we stated in *Lucas v. Anchorage Police & Fire Retirement Board,* "although someone ... is not well suited for work ... he [may] nonetheless [be] capable of performing it." [19] This is a distinction that the hearing officer in this case failed to recognize. To find suitability the hearing officer was required to consider not only Wescott's "physical fitness" for the job, that is, whether he was capable of performing roustabout work, but also any detriment that the work might cause to Wescott's undisputed physical impairment, club feet.

Cases in other jurisdictions support this distinction between capability and suitability. For example, in *Israel v. Bally's Park Place, Inc.,* a closely analogous case, a New Jersey appellate court reversed the denial of benefits to a casino employee whose work environment threatened her recovery from alcoholism.[20] The court held that Israel qualified for benefits even though her physician had released her back to work.[21] The court decided that Israel was "not required to show ... that her illness ... prevent[ed] her from performing the duties of her employment," [22] but only that "the environment at her job aggravated her illness or will impair her continued recovery." [23] Since Israel's therapist expressed concern that the casino environment was "high risk," the appellate court concluded that Israel had met this standard.[24] Although Israel was undeniably capable of performing her duties, the job was not suitable for her because it threatened her sobriety and recovery.[25]

In finding that the roustabout position was suitable work, the hearing officer focused on Wescott's medical release to determine that Wescott was medically capable, i.e., physically fit, to perform the job. The hearing officer found that, "in light of [his] full medical release, without restrictions, the roustabout position was medically suitable for Mr. Wescott." But the medical release addressed the issue of Wescott's physical ability to perform roustabout work, not the risks that this work might pose to his club feet.[26] In fact, in the nine-week postoperative report that he prepared contemporaneously with Wescott's medical release of March 6, 1997, Dr. Mason expressed reservations about the potential harmful effects that roustabout work might have on Wescott's congenital condition, emphasizing that "it would be in [Wescott's] best interest to pursue more of a position that did not require standing so long, ambulating on hard or uneven surfaces, etc."

These observations echoed Dr. Mason's first post-operative report, in which he advised that Wescott "would benefit by pursuing a job opportunity that does not require prolonged standing, prolonged walking, especially on hard surfaces.... With the wear and tear and degenerative condition I found in his left foot, I think that this would give him the best chance of good longevity as part of the work force." They are reinforced by Dr. Brockman's independent evaluation, which unequivocally recommended that Wescott try "to get into an area of employment that is less physically demanding and which requires less standing and walking time."

The hearing officer did not ignore this evidence entirely, finding that "absent specif-

---

**19.** 960 P.2d 1151, 1157 (Alaska 1998).

**20.** *See Israel v. Bally's Park Place, Inc.,* 283 N.J.Super. 1, 660 A.2d 1259 (App.Div.1995).

**21.** *See id.* at 1260.

**22.** *Id.* at 1261.

**23.** *Id.*

**24.** *See id.* at 1260.

**25.** Other cases lend further support to the notion that a worker may be physically capable and yet unsuited for a job. *See Rooney v. Employment Appeal Bd.,* 448 N.W.2d 313 (Iowa 1989) (holding that if working at a bar and liquor store aggravated claimant's alcoholism, as his nurse advised it would, then he would have good cause to leave); *Kramer v. New Mexico Employment Sec. Div.,* 114 N.M. 714, 845 P.2d 808 (1992) (holding that a secretary had good cause to resign from her secretary position since her doctor indicated that the job aggravated her pre-existing back condition).

**26.** As the precedent manual appropriately cautions, "[a]lthough a physician's statement is valuable in determining ... a claimant's [condition], it is of less value in determining whether a particular job is detrimental to a claimant's health." That is because the physician is "usually not familiar with the conditions of the job itself." *See* Precedent Manual at SW 235.05–2 (July 1999).

ic advice for [Wescott] to quit work or immediately change occupations," Dr. Mason's "suggestion that Mr. Wescott pursue other work in the future ... failed to show that the roustabout job was unsuitable." But in viewing Dr. Mason's "suggestion" as advice for "the future" and determining that, as such, it was insufficient to overcome the doctor's "full medical release, without restrictions," the hearing officer confined her consideration to the issue of physical capacity. The hearing officer made no separate findings concerning—and evidently failed to consider independently—the risk that roustabout work might have adverse effects on Wescott's impairment, thereby rendering the work unsuitable despite his physical ability to perform it.

It is immaterial that the hearing officer went on to find that Wescott lacked good cause to quit his roustabout job. For as we have observed, the "good cause" standard—and its attendant requirements that a worker have compelling reason to leave work and exhaust all reasonable alternatives before quitting[27]—attaches only when a worker quits work that is suitable. A worker is always free to quit unsuitable work.[28] And in the case of a worker who suffers from a physical disability, work is unsuitable when it "is detrimental to the claimant's health."[29]

While the hearing officer's finding on suitability emphasized that Dr. Mason had not advised Wescott to "quit work or immediately change occupations," neither the statute governing work-suitability[30] nor the department's precedent manual[31] requires that a risk of adverse effects be imminent to render work unsuitable.

To the contrary, under AS 23.20.385(b) the hearing officer was required to evaluate the significance of the risk of harm that roustabout work posed to Wescott's condition by objectively inquiring whether "a reasonably prudent person in [Wescott's] circumstances" would have continued to work as a roustabout.[32]

Since the hearing officer failed to apply this standard in concluding that Wescott's work was suitable, and since the commissioner adopted the hearing officer's findings as the basis for his decision affirming the department's denial of work-week benefits, we must vacate the decision and remand for reconsideration under the foregoing standard.[33]

## IV. CONCLUSION

Because the department incorrectly applied the law and based its decision on an erroneous standard, we REVERSE its decision and REMAND for reconsideration under the standard set out in this opinion.

---

**27.** *See* AS 23.20.379(a)(1); 8 AAC 85.095(c); Precedent Manual at VL 5–3 to –4 (Oct.1999).

**28.** *See id.* at VL 5–3 (Oct.1999).

**29.** *See id.* at SW 235.25–1 (July 1999).

**30.** AS 23.20.385(b) (quoted *supra*, note 14).

**31.** *See* Precedent Manual at SW 235.25–1.

**32.** *See* AS 23.20.385(b) (quoted *supra*, note 14). To apply a more stringent test would, in our view, discourage workers with disabilities from accepting challenging employment by penalizing them for attempting work that ultimately proves to have detrimental effects. We note that courts in other jurisdictions have expressed reluctance to penalize employees for accepting jobs that proved to be unsuitable for them. *See Krulla v. Barnett Bank,* 629 So.2d 1005 (Fla.Dist.App. 1993) (awarding benefits to a man who terminated his employment because he was physically unable to perform the manual labor required, and reasoning that an unemployed claimant should not be penalized for taking an unsuitable position); *Herman v. Florida Dep't of Commerce, Indus. Relations Comm'n,* 323 So.2d 608 (Fla. Dist.App.1975) (finding employee eligible for benefits and reasoning that she ought not be penalized for seeking employment which was beyond her physical ability and hence unsuitable).

**33.** Wescott separately argues that the hearing officer's suitability finding is not supported by the evidence, that the commissioner effectively reversed the hearing officer's finding of suitable work by concluding that Wescott's physical condition would require APC to make some accommodations in his job assignment, and that even if his work was suitable, he had good cause to leave. Our decision to remand for reconsideration makes it unnecessary to address these arguments.