Carol CALVERT, Appellant,

v.

STATE of Alaska, DEPARTMENT OF LABOR & WORKFORCE DEVELOPMENT, EMPLOYMENT SECURITY DIVISION, Appellee.

No. S–13721.

Supreme Court of Alaska.

April 15, 2011.

Carol Calvert, pro se, Soldotna, Appellant.

Erin Pohland, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Carol Calvert quit her job at a seafood processing plant and filed for unemployment insurance benefits. Her reasons for quitting included difficulties with transportation to work and personality conflicts with coworkers. The Department of Labor's unemployment insurance claim center determined that Calvert voluntarily left work without good cause; as a result, she was statutorily ineligible for unemployment benefits for the first six weeks of her unemployment, and her maximum potential benefits were reduced by three times the weekly benefit amount.

Calvert appealed to the Department of Labor's Appeal Tribunal where the assigned Hearing Officer found that transportation problems were the "precipitating event" in Calvert's decision to quit. The Hearing Officer concluded that, although Calvert's transportation problems may have provided a compelling reason to quit, Calvert had not "exhaust[ed] all reasonable alternatives prior to quitting," as is required in order to show good cause. The Hearing Officer affirmed the claim center's determination.

The Commissioner of the Department of Labor affirmed the Hearing Officer's decisions, as did the superior court. For the reasons explained below, we affirm.

## II. FACTS AND PROCEEDINGS

Carol Calvert was a seasonal employee of Snug Harbor Seafoods in Kenai. She worked there for the first time during the summer of 2007. She was rehired on March 10, 2008, and quit on April 6, 2008. She filed for unemployment benefits on April 6.

The Department of Labor's (Department) unemployment insurance claim center sent Calvert a "Voluntary Leaving Statement" to complete and return in order to provide additional information about her separation from employment. Calvert returned the Voluntary Leaving Statement on May 9. In her explanation of why she quit, she cited conflicts that had begun during the 2007 season with a supervisor, Mike, and his girlfriend,

Hope (also a Snug Harbor employee). Calvert alleged that the conflict began when the plant manager asked Calvert to run the "gear department" and planned to move Hope out of her position in that department. Calvert also described her disappointment at the March 2008 departure of Brandi O'Reagan, who was the plant manager during the 2007 season and who had encouraged Calvert to return for the 2008 season. Calvert reported that Mike cut her hours immediately after O'Reagan left, allegedly in retaliation for Calvert's conflicts with Hope. Calvert was also concerned that Richard King, the plant manager who replaced O'Reagan, was aligned with Mike and Hope, and shared their hostility toward her.

Calvert also described transportation difficulties. She biked ten miles each way to get to Snug Harbor, so she required ample notice of the start times for her shifts. Work shifts were announced via a "hotline." In 2007, shifts were posted so there was typically a three-hour lead time. According to Calvert, in 2008 the hotline was updated less frequently, later in the day, and sometimes as little as half an hour in advance. Calvert argued, "[i]t became a cruel guessing game whether [she] should start for work on [her] bike." She found the local public transit agency to be "relentlessly uncooperative" in arranging transportation, her bike broke, and she anticipated increased difficulties associated with springtime road construction on her route to work.

In addition, Calvert expressed concern on her Voluntary Leaving Statement about the new plant manager's attitude toward workplace safety. During the 2007 season, a co-worker standing next to Calvert was "badly shocked" after water hit an electric box. When Calvert was asked later that season to coil an extension cord lying in several inches of water, she expressed her safety concerns in King's presence. According to Calvert,

King "looked at [her], turned his back on [her], and has not spoken to [her] since," except when she approached him about her hours.

The Department's claim center contacted Calvert on May 13 to ask what "final incident" caused her to quit. Calvert reiterated the reasons cited in her Voluntary Leaving Statement:

> There was really no final incident, just a compilation of everything that happened, the old branch manager quitting without telling me, and then problems with the new manager. I quit because my hours week [sic] being cut, and problems with co-workers, and transportation problems.... I talked to the owner my last day about them cutting my hours, and he didn't seem like he wanted to do anything about it.... I don't know if it was any one thing, just everything piled together.

On May 14, the claim center issued a notice of determination finding that Calvert "quit work at Snug Harbor Seafoods because [she was] unhappy with the new manager's supervisory style and apportionment of work." The claim center reasoned that because Calvert had not provided information demonstrating that the manager's actions were "hostile or discriminatory," she had not established "good cause for leaving." As a result, Calvert was denied waiting-week credit for the first week of employment and benefits for the next five weeks,[1] and her maximum potential benefits were reduced by three times the weekly benefit amount.[2]

On June 16, Calvert filed a Notice of Unemployment Insurance Appeal with the Department of Labor's Anchorage Appeal Tribunal. In her appeal, she argued: (1) the claim center did not establish that the work she left was "sufficient and suitable," and she was therefore not required to show good

---

1. Under AS 23.20.379(a)(1), "[a]n insured worker is disqualified for waiting-week credit or benefits for the first week in which the insured worker is unemployed and for the next five weeks of unemployment" if the worker left the "last suitable work voluntarily without good cause." "Waiting-week credit" refers to credit received for the initial week of unemployment, during which the worker does not immediately receive

unemployment insurance benefits but still accrues benefits eligibility. *See* Alaska Department of Labor, Frequently Asked Questions: Filing for Unemployment Insurance, *available at* http://labor.state.ak.us/esd_unemployment_insurance/faq.htm.

2. AS 23.20.379(c).

cause for leaving it; (2) "good cause" for leaving the job existed in any case based on Calvert's insufficient work hours, transportation issues, lack of notice by the employer regarding work hours, and the patterns of "[w]orkplace violence" she experienced; and (3) the Department of Labor has a duty to better inform employees on the rules and requirements for unemployment insurance benefits. In addition to her brief, Calvert submitted a request for subpoenas to the Appeal Tribunal.

Hearing Officer Kathy A. Thorstad conducted the Appeal Tribunal hearing telephonically on July 29, 2008. The Hearing Officer observed that, under AS 23.20.379, a person who quits a job without good cause is ineligible for full unemployment insurance benefits. She also explained that the burden of showing good cause is on the employee seeking benefits and that a worker has "good cause" when she has a compelling reason for leaving work and has exhausted all reasonable alternatives to quitting.

During the hearing, the Hearing Officer heard testimony from Calvert, Snug Harbor plant manager King, and the president of Snug Harbor, Paul Dale. Calvert testified that she quit her job on April 6 because she was "upset all day long" and made her decision "based on the amount of stress . . . [and] based on the problems [she] was having with transportation." In response to the Hearing Officer's questions about her transportation difficulties, Calvert stated that she had not realized that biking to work "would be much more difficult" during March than it had been when she worked at Snug Harbor the previous summer. She noted that her bike broke down and weather conditions were bad in March and April, forcing her to rely on the Central Area Rural Transit System (CARTS). CARTS requires its passengers to book trips hours in advance, which was difficult for Calvert given her unpredictable work schedule and King's habit of posting the hours for the following day after 6:00 p.m., when CARTS had stopped answering its phones for the evening. According to Calvert, her only other transportation option was to take a taxi, which she stated would not be cost-effective given the amount of money she was making at her job.

The Hearing Officer also questioned Calvert about her work-related stress. Calvert stated that Mike cut her hours after O'Reagan's departure and told her that the decision had been sanctioned by Dale. Calvert noted that she had not asked Mike why her hours were being cut but later asked King, the plant manager, who told her he would "see that the work got done." She also recounted a subsequent conversation with Dale, who told her he had not authorized Mike to cut her hours. Calvert told the Hearing Officer that she did not directly ask Dale to address the situation with Mike, explaining that she "didn't feel that it was necessary" because she assumed someone in Dale's position would "look into it and . . . find out exactly what happened." Calvert also stated that she did not directly confront Mike after learning that Dale had not authorized the reduction in her hours.

When the Hearing Officer asked Calvert what efforts she made to keep her job, Calvert responded that she tried to get CARTS to provide her with transportation to work and that she asked King and Dale about the reduction to her hours, "and that's about it." The Hearing Officer asked Calvert whether she explicitly informed King or Dale that Mike's "messing with [her] hours was creating enough of a hardship that [she] would not be able to continue to work if it wasn't corrected"; Calvert confirmed that she did not. The Hearing Officer then asked Calvert whether it was her transportation difficulties or her problems with Mike that caused her to quit. Calvert answered, "It's both of them. . . . I don't know if one . . . had been taken away, if the other one could have been solved and vice versa." The Hearing Officer rephrased her question and asked, "If CARTS had not been giving you any difficulty on that day, would you still have quit your job?" Calvert replied, "I think I would have gone to work, yes. I think I would have given it another week. . . . I might have complained harder."

Plant manager King testified that he became aware of Calvert's problems with Mike after Mike reported having had a confronta-

tion with Calvert about her hours. He claimed that Calvert's impression that she was being singled out for reduced hours was incorrect, and that the company was trying to "keep hours at a minimum" based on its "limited product" in April. He also stated that he had not known why Calvert quit her job until he saw the exhibits she presented at the hearing.

Dale testified that he did not recall the conversation Calvert reported having had with him about whether Mike had been authorized to cut her hours, but that he "wouldn't dispute it" and it "sound[ed] plausible." Dale added that, after Calvert quit, he asked King "on at least four occasions" if he had contacted her "to discuss her concerns regarding employment"; King reportedly told Dale that he had left messages for Calvert but had not heard back from her. In subsequent appeals, Calvert denied receiving any calls or messages, but she did not raise this point before the Hearing Officer.

The Hearing Officer affirmed the claim center's determination. Because she found that Calvert's transportation problems were the "precipitating event" in her decision to quit, the Hearing Officer did not address Calvert's conflicts with supervisors and co-workers.[3] The Hearing Officer determined that, although the loss of transportation can create a compelling reason for a worker to quit a job, Calvert had not "exhaust[ed] all reasonable alternatives prior to quitting." She found that "[t]he claimant did not discuss her transportation problems with the employer nor did she request a possible adjustment to her work schedule which would have enabled her to use the transit system and continue working." The Hearing Officer concluded that Calvert had not established that she had "good cause for quitting suitable work." The Hearing Officer ruled that Calvert was not entitled to waiting-week benefits under AS 23.20.379.

Calvert appealed the Hearing Officer's decision to the Commissioner of the Department of Labor. In her appeal, she argued that the Hearing Officer had confused the facts; that her phone bills contradicted King's claim that he had attempted to call her after she quit; that the Hearing Officer's reliance on Calvert's testimony about her decision to quit on April 6 was "sleight of hand"; and that there had been no reason to believe talking to her employer about her transportation problems would lead to an adjustment of hours or other resolution. On October 3, 2008, the Commissioner affirmed the Hearing Officer's decision, finding that any factual errors in the decision were not prejudicial and adopting the Hearing Officer's finding that Calvert did not give Snug Harbor a chance to adjust "by making known her problems in getting to work." The Commissioner upheld the Hearing Officer's conclusion that Calvert failed to show good cause for quitting.

Calvert subsequently appealed to the superior court, which held that "[t]here was substantial evidence to support the Hearing Officer's ... conclusion that Calvert did not exhaust all reasonable alternatives before voluntarily quitting, a requirement for finding good cause." The superior court decision also found that the Department had adequately informed Calvert of the law regarding unemployment benefit eligibility. Calvert appeals.

## III. STANDARD OF REVIEW

Calvert appeals the decision of the superior court, which affirmed the decisions of the Commissioner of the Department of Labor and the Appeal Tribunal for the Department of Labor. As we have noted, "when the superior court acts as an intermediate court of appeal, no deference is given to the lower court's decision"; rather, we "independently scrutinize directly the merits of the administrative determination." [4] In this case, our

---

**3.** The Department of Labor's Benefit Policy Manual (hereinafter BPM) provides that "A worker may give two or more reasons for quitting. However, the one reason that was the precipitating event is the real cause of the quit, with the other reasons being incidental. In such cases, good cause depends on the precipitating event and the other reasons are irrelevant." Depart-

ment of Labor, BPM at VL 385–2 (Nov.2009), *available at* http://labor.state.ak.us/esd_unemployment_insurance/ui-bpm.htm.

**4.** *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987); *see also Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

independent review has led us to substantial agreement with the superior court's carefully considered decision.

 We apply four standards of review to administrative decisions. The "substantial evidence" test applies to questions of fact.[5] The "reasonable basis" test is used for questions of law involving agency expertise.[6] Where no expertise is involved, questions of law are reviewed under the "substitution of judgment" test.[7] Finally, the "reasonable and not arbitrary" test applies to review of administrative regulations.[8]

 We have held that the question of whether a person was dismissed from her job for "misconduct" (one of the grounds for disqualification for waiting-week credits under AS 23.20.379(a)(2)) is a question of fact to be reviewed under the "substantial evidence" test.[9] Consistent with that holding, whether Calvert voluntarily quit suitable work for good cause is reviewed here as a question of fact.[10] In applying this test, we must determine whether there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"[11]; the court "does not reweigh the evidence or choose between competing inferences."[12]

 "[D]ue process and evidentiary arguments raise questions of law which we will review *de novo.*"[13]

## IV. DISCUSSION

### A. The Unemployment Insurance Benefits Eligibility Framework

 Under AS 23.20.379(a), a worker may be partially disqualified from receiving benefits if she "left ... suitable work voluntarily without good cause" or was "discharged for misconduct." These rules are further detailed in the Department's Benefit Policy Manual.[14] The BPM clarifies that suitability and good cause are independent inquiries. "A worker who voluntarily leaves unsuitable work leaves with good cause"[15] and need not make a separate showing of good cause to quit.[16] The factors relevant to

5. *Handley,* 838 P.2d at 1233 (citing *Jager v. State,* 537 P.2d 1100, 1107 n. 23 (Alaska 1975)).

6. *Id.*

7. *Id.*

8. *Id.*

9. *Smith v. Sampson,* 816 P.2d 902, 904 (Alaska 1991) (applying the substantial evidence test to the "factual determination" of whether an employee was dismissed from his job for "misconduct" for purposes of AS 23.20.379); *see also Risch v. State,* 879 P.2d 358, 363 n. 4 (Alaska 1994).

10. Though the Hearing Officer's Appeal Tribunal Decision separates its "Findings of Fact" from its "Conclusion," the conclusion section includes the Hearing Officer's finding that Calvert quit without good cause. The Hearing Officer's conclusion appears to be entirely fact-based; the determinative factual question was "whether the claimant exhausted all reasonable alternatives prior to quitting her job."

11. *Storrs v. State Medical Bd.,* 664 P.2d 547, 554 (Alaska 1983) (citing *Keiner v. City of Anchorage,* 378 P.2d 406, 411 (Alaska 1963)).

· 12. *Id.* (citing *Interior Paint Co. v. Rodgers,* 522 P.2d 164, 170 (Alaska 1974)).

13. *Smith,* 816 P.2d at 904; *see also Childs v. Kalgin Island Lodge,* 779 P.2d 310, 313 (Alaska 1989) (holding that findings of the Alaska Workers' Compensation Board will not be vacated when supported by substantial evidence, but "independent review of the law is proper" where "the Board's decision rests on an incorrect legal foundation").

14. The BPM fulfills 8 AAC 85.360's mandate that "the department ... maintain a policy manual interpreting the provisions of AS 23.20 and this chapter." We have looked to the BPM to interpret AS 23.20 in the past, and continue to do so here. *See, e.g., Wescott v. State, Dep't of Labor,* 996 P.2d 723 (Alaska 2000) (adopting the BPM's criteria for determining good cause and citing the BPM throughout). The *Wescott* opinion refers to the BPM as the "Precedent Manual." The BPM is divided into eight sections: Able & Available, Evidence, Labor Dispute, Miscellaneous, Misconduct, Suitable Work, Total & Partial Unemployment, and Voluntary Leaving. Content within each section is indicated by an combination of the abbreviated section title (e.g., "VL" for Voluntary Leaving, "EV" for Evidence) and a numbered subsection (e.g., VL 385–2). Individual subsections may have different dates based on their most recent updates.

15. BPM at VL 425–1 (Nov.2009).

16. *Id.* at VL 5–2 (Apr.2004); *see also Wescott,* 996 P.2d at 726.

suitability are distinguishable from those affecting good cause: "[s]uitability is based on circumstances surrounding the job, and usually involves a comparison of the offered work with other similar work in the locality. . . . Good cause is based on personal circumstances surrounding the claimant . . . and not directly related to the conditions of the work." [17] And while a worker may leave unsuitable work without further efforts to remedy the situation, establishing good cause for leaving work that is otherwise suitable requires a two-step showing: not only must "[t]he underlying reason for leaving work . . . be compelling," but "[t]he worker must exhaust all reasonable alternatives before leaving the work." [18]

### B. The Hearing Officer Correctly Determined That Calvert Left Suitable Work.

### 1. The Hearing Officer was required to analyze the suitability of Calvert's job at Snug Harbor.

In finding that Calvert failed to establish good cause for quitting suitable work, the Hearing Officer did not explicitly discuss whether Calvert's job at Snug Harbor was suitable. Calvert argues that the hearing officer improperly "abandoned the issue of suitable work" and therefore did not correctly analyze whether she was required to show good cause for leaving. We agree that the Hearing Officer was required to analyze the suitability of Calvert's work. But we hold that the Hearing Officer's decision implicitly found that Calvert's work was suitable.

■■■■ Alaska Statute 23.20.385 provides that the suitability of work depends on a range of factors, including whether wages,

hours, or other conditions of work are substantially less favorable than prevailing conditions in the locality; the degree of risk to a claimant's health, safety, and morals; the claimant's physical fitness for the work; the distance of the work from the claimant's residence; "and other factors that influence a reasonably prudent person in the claimant's circumstances." [19] Although suitability of work may not be presumed, it need not be analyzed in all cases.[20] Suitability of work must be examined if: (1) a worker objects to the suitability of wages, hours, or other "conditions of work"; (2) a worker specifically raises the issue of suitability of work; or (3) facts appear during investigation of a worker's claim that put the Department on notice that wages or other conditions of work may be substantially less favorable than prevailing conditions for similar work in the locality.[21]

Calvert raised the issue of suitability in her initial appeal to the Appeal Tribunal, arguing that the Department "makes no claim of sufficient and suitable work from my employer." She did not provide explicit justification for the claim that her work at Snug Harbor was unsuitable, but elsewhere in her appeal and in her initial Voluntary Leaving Statement, Calvert did identify a number of concerns that might be considered objections to "conditions of work" sufficient to place the Hearing Officer on notice that conditions were potentially unfavorable. Specifically, Calvert cited safety concerns, "workplace violence," personality conflicts, and difficulties with transportation to work.

■■■■ The Department contends that none of the issues Calvert raised other than transportation could render her work unsui-

---

17. BPM at SW 5–4 to 5–5 (Aug.2008).

18. *Id.* at VL 210–1 (Oct.1999). The language of the statute and the BPM, while defining suitability and good cause as separate inquiries, creates significant overlap in the criteria applicable to each. AS 23.20.385(b), for example, identifies a single set of factors to be used "[i]n determining whether work is suitable for a claimant and in determining the existence of good cause for leaving or refusing work." Similarly, the BPM includes statements such as "work that is unreasonably distant from a worker's residence is unsuitable, and the worker has good cause for

leaving it," *id.* at VL 150–2 (Nov.2010), followed by a discussion addressing distance from work primarily in terms of good cause. As a result, it can be difficult to draw a clear line between the two concepts in practice.

19. AS 23.20.385(a)-(b); *see also* BPM at VL 425–1 to 425–3 (Nov.2009).

20. BPM at EV 190.3–1 (July 1999).

21. *Id.* at VL 425–1 (Nov.2009); *see also id.* at EV 190.3–1 to 190.3–2 (July 1999).

table because they were not found to be the "precipitating event" that led Calvert to quit. We disagree with this reasoning. The "precipitating event" analysis described in the BPM identifies which of a worker's reasons for leaving is to be analyzed for good cause: "good cause depends on the precipitating event and the other reasons [for quitting] are irrelevant."[22] By contrast, the determination of whether work is unsuitable is a separate inquiry that is not similarly limited; if work is unsuitable, a worker has good cause to leave it without having to make a separate showing.[23] The fact that a circumstance did or did not precipitate a worker's decision to quit is not relevant to whether the circumstance may render work unsuitable.

The Department also argues that none of the issues Calvert raised can properly be considered "conditions of work" as the term is used in the BPM. It contends that this term should be interpreted to refer not to work conditions generally, but to "an essential aspect of the job."[24] The Department argues that workplace hostility and transportation problems of the type Calvert claims are not properly categorized as "essential aspects" of a job and should instead be considered under the good cause rubric.[25]

■ We find this argument convincing as it applies to Calvert's transportation problems. The BPM provides that "[w]ork that is unreasonably distant from a worker's residence is unsuitable and the worker has good cause for leaving it."[26] The BPM illustrates this rule with a case involving a claimant whose employer assigned him to work in a community 118 miles from his home; the Commissioner found this to be an "unreasonable commuting distance" and concluded that

the job was unsuitable, giving the claimant good cause for quitting.[27] But as the Department argues, there is "a subtle but logical distinction" between distance to work and personal factors affecting a commute; "[p]ersonal circumstances that render a reasonable, customary commute no longer feasible cannot make a job unsuitable." Here, Calvert's ten-mile commute was not "unreasonably distant" by any objective measure; she had easily made the commute by bike during the previous summer and would have had no problem getting to work at other times of year if her means of transportation had been less limited. And unlike the case described in the BPM, Calvert's employer had not asked her to relocate or done anything else to change the distance she had to travel to get to work. Her difficulties stemmed from personal circumstances, not from an inherent characteristic of her job at Snug Harbor; they did not give rise to a question of suitability.

■ In contrast with Calvert's transportation issues, the workplace hostility and safety breaches Calvert described in her Voluntary Leaving Statement and Appeal Tribunal brief may be considered "circumstances surrounding the job," rather than merely "personal circumstances surrounding the claimant."[28] By mentioning suitability and raising workplace hostility and safety issues, Calvert objected to conditions of her work, raised the issue of suitability, and put the Department on notice that conditions at Snug Harbor might be less favorable than standard conditions in the locality. Thus, the Hearing Officer was obligated to analyze the suitability of Calvert's job before determin-

---

22. *See id.* at VL 385–2 (Nov.2009).

23. *Id.* at VL 5–2 (Apr.2004); *see also Wescott,* 996 P.2d at 726.

24. In support of this reading, the Department cites the fact that a suitability inquiry does not require a claimant to show that she exhausted reasonable alternatives before leaving a job, "presumably because an issue that makes work unsuitable is a fundamental attribute of the job itself" and cannot be easily changed. By contrast, a worker who quits for "good cause" unrelated to suitability is required to demonstrate that she explored alternatives, which implies that

good cause is determined by factors that are at least potentially within the worker's power to control or adjust.

25. The Department's brief does not address the safety concerns raised by Calvert in her Voluntary Leaving Statement.

26. BPM at VL 425–2 (Nov.2009).

27. *Id.* (citing Appeal Tribunal Decision, Docket No. 99–1253, September 2, 1999).

28. *See* BPM at SW 5–4 to 5–5 (Aug.2008).

ing that she had failed to show good cause for quitting.

## 2. Calvert did not show that her job at Snug Harbor was unsuitable.

██ Although the Hearing Officer did not explicitly address the question of suitability in reviewing Calvert's appeal, her determination that Calvert "did not establish that she had good cause for quitting suitable work" implicitly concluded that Calvert's work was suitable. Upon independent review of the evidence, we agree with the Hearing Officer's implied finding that Calvert did not show that her job at Snug Harbor was unsuitable.

Calvert mentioned "workplace violence" in her written appeal to the Hearing Officer, but she neither explained what she meant by this term nor provided any evidence of "physical violence" at Snug Harbor. Construing this phrase in light of Calvert's oral testimony, we understand her to refer to workplace hostility and to the personality conflicts she had with Mike and plant manager King. We hold that the level of hostility Calvert describes at Snug Harbor, while no doubt uncomfortable, did not rise to the level of unsuitability. Calvert's personality conflicts did not pose a risk to her "health, safety, and morals."[29] And she does not claim she experienced threats or even serious verbal altercations. Rather, she describes tensions of the type that commonly develop in a workplace as a result of poor communication and the suspicion that coworkers are receiving preferential treatment based on personal relationships. Although certainly not ideal, these workplace conditions did not render Calvert's job "unsuitable."

Nor does Calvert's description of unsafe practices indicate that her work was unsuitable. The incident Calvert described in her Voluntary Leaving Statement took place in 2007. The BPM provides that "[i]f the conditions of work violate a state or federal law concerning wages, hours, safety, or sanitation, the worker has good cause for leaving, regardless of the length of time that the worker has worked under the objectionable condition."[30] Therefore, the fact that Calvert continued to work at Snug Harbor the following year does not, by itself, imply that the work was suitable. But Calvert did not describe any safety-related incidents in 2008 or offer evidence that unsafe practices were an ongoing condition of work. The single 2007 incident cited by Calvert does not provide evidence of health and safety risks sufficient to demonstrate unsafe conditions rendering work at Snug Harbor unsuitable in 2008.

## C. Calvert Did Not Show Good Cause For Voluntarily Leaving Work.

██ If the work a claimant has left is determined ·to be suitable, that claimant's eligibility for unemployment insurance benefits depends on whether she left for good cause.[31] To show good cause, a worker must demonstrate that the underlying reason for leaving work was compelling, and that the worker exhausted all reasonable alternatives before leaving the work.[32] The burden of demonstrating both elements of good cause is on the worker.[33] The BPM provides that "[a] compelling reason is one that causes a reasonable and prudent person of normal sensitivity, exercising ordinary common sense, to leave employment."[34]

██ The BPM further notes that "[a] reasonable and prudent worker sincerely interested in remaining at work attempts to correct any condition or circumstance that interferes with continued employment."[35] In order to exhaust all reasonable alternatives, the worker must notify the employer of the problem and request adjustment; the worker must also bring the problem to the attention of someone with the authority to

**29.** *Id.* at VL 425–1 (Nov.2009).

**30.** *Id.* at VL 425–3 (Nov.2009).

**31.** *Id.* at VL 210–1 (Oct.1999).

**32.** *Id.*

**33.** *Id.* at VL 5–3 (Apr.2004); *id.* at EV 5–1 (July 1999); *see also Wescott v. State, Dep't of Labor,* 996 P.2d 723, 727 (Alaska 2000) (citing *Reedy v. M.H. King Co.,* 128 Idaho 896, 920 P.2d 915, 918 (1996)).

**34.** BPM at VL 210–1 (Oct.1999).

**35.** *Id.* at VL 210–2 (Oct.1999).

make the necessary adjustments, describe the problem in sufficient detail to allow for resolution, and give the employer enough time to correct the problem.[36] At the same time, "a worker is not expected to do something futile or useless in order to establish good cause for leaving employment."[37]

We agree with the Hearing Office that Calvert failed to exhaust alternatives to quitting and therefore did not demonstrate good cause for leaving work.

### 1. We analyze both transportation problems and workplace hostility as potential precipitating causes.

 The Hearing Officer identified transportation problems as the precipitating cause of Calvert's decision to quit. The BPM provides that, where a worker gives multiple reasons for quitting, "the one reason that was the precipitating event is the real cause of the quit, with the other reasons being incidental. In such cases, good cause depends on the precipitating event and the other reasons are irrelevant."[38] In other words, whether a worker has shown good cause for quitting is to be analyzed in reference *only* to the event that directly led the worker to quit and not to any other events or circumstances.

Throughout her application for unemployment benefits and subsequent appeals process, Calvert identified two major factors—transportation obstacles and workplace hostility—in her decision to quit. During the hearing on her administrative appeal, the Hearing Officer asked Calvert whether it was her transportation difficulties or personality conflicts that caused her to quit. Calvert answered, "It's both of them ... I don't know if one ... had been taken away, if the other one could have been solved and vice

versa." The Hearing Officer then asked, "If CARTS had not been giving you any difficulty on that day, would you still have quit your job?" Calvert replied, "I think I would have gone to work, yes. I think I would have given it another week.... I might have tried the new schedule. I might have complained harder." Based on this testimony, the Hearing Officer concluded that the precipitating event in Calvert's quitting was the loss of transportation, and she therefore limited her good cause analysis to transportation issues.

In her brief to our court, Calvert objects that the Hearing Officer took her words out of context, focusing on "[t]he one comment [she] elicited which was speculative, retrospective, and in conflict with prior testimony and actions." While there is no indication that the Hearing Officer's question was intentionally designed to "trick" Calvert—indeed, the question's structure simply reflected the BPM's emphasis on determining which event led a worker to "quit at [a] particular time"[39]—we nonetheless acknowledge that the Hearing Officer's question may have elicited a different answer than Calvert would have provided in response to an alternatively worded or more open-ended inquiry.[40] Therefore, we analyze both transportation problems and workplace hostility to determine whether Calvert demonstrated good cause for leaving work on the basis of either issue.

### 2. Calvert did not show good cause for leaving work on the basis of her transportation problems.

### a. Calvert's transportation problems did provide a compelling reason to quit.

 The first element of good cause requires that a worker have a "compelling

---

36. *Id.* at VL 160–2 (Nov.2010).

37. *Id.* at VL 210–2 (Oct.1999). The BPM quotes the Commissioner of Labor: "The 'good cause' test only requires a worker to exhaust all reasonable alternatives. An alternative is reasonable only if it has some assurance of being successful.... [T]here must be a foundation laid that the alternative does have some chance of producing that which the employee desires." *Id.* at VL 160–1 (Nov.2010).

38. *Id.* at VL 385–2 (Nov.2009); *see also id.* at VL 385–3 (Nov.2009) ("[T]he precipitating event is

the reason for the separation, although the combined effect of the reasons may be taken into account in determining good cause.").

39. *Id.* at VL 385–2 (Nov.2009).

40. For instance, as Calvert pointed out in her appeal brief to the Commissioner of Labor, "[t]he Hearing Officer did not ask the opposite question: Would you have quit if your job security and agreement with your employer had not been tampered with [as a result of personality conflicts]?"

reason" for leaving work.[41] In contrast to the requirements for determining suitability, "[t]here is no requirement that [a] worker's reasons for leaving work be connected with the work. Either work-connected or personal factors may present sufficiently compelling reasons."[42] 8 AAC 85.095 provides a limited list of factors the Department may consider in determining the existence of good cause, including those factors identified in AS 23.20.385(b). One such factor is "distance of . . . available work from the claimant's residence."[43] The BPM clarifies that, for purposes of determining good cause, "[t]he actual mileage from the worker's residence to work is never the determining factor in establishing compelling reasons. It is the time and expense of commuting which must be considered."[44]

The Hearing Officer concluded in her decision that "[t]he loss of transportation can create a compelling reason for a worker to quit [his or her] job." We agree that Calvert demonstrated that her transportation difficulties gave her a compelling reason to quit. The "actual mileage" from Calvert's home to Snug Harbor was not unusual, but the "time and expense" involved in her commute were significant: her bike was gradually breaking down to the point where her commute took an hour and a half each way, CARTS would not allow her to schedule open-ended trips or make last-minute arrangements to fit her work schedule, and taxi fare was prohibitively expensive. These facts provide substantial evidence that meets the standard for showing a compelling reason to quit: left unresolved, they would cause a "reasonable and prudent person of normal sensitivity . . . to leave employment."[45]

**b. Calvert did not exhaust all reasonable alternatives before leaving work due to transportation problems.**

 The Hearing Officer noted in her findings of fact that Calvert had never told her supervisor that her work schedule—and particularly the lack of notice regarding working hours—was creating transportation problems for her. The Hearing Officer also found that Snug Harbor made repeated attempts to contact Calvert after she quit and was not aware of her reasons for quitting until the hearing. The Hearing Officer concluded that, because Calvert did not discuss her transportation problems with her employer or request an adjustment to her work schedule, she did not exhaust all reasonable alternatives prior to quitting and therefore left without good cause. We agree.

Calvert argues that the primary alternative envisioned by the Hearing Officer, i.e., talking to her supervisors and seeking adjustments to her schedule, was "neither reasonable nor proved to be viable." First, she suggests that the Hearing Officer's failure to investigate why Snug Harbor's representatives (presumably King and Dale) "did not talk to [Calvert] when she brought problems to them" casts doubt on whether her employers would have been willing to accommodate her requests. Second, she contends that "her work schedule was reliant upon the schedule of everyone else" and was therefore not amenable to adjustment.[46] Finally, Calvert contends that the Hearing Officer erroneously relied upon Dale's unreliable "hearsay" report that King had attempted to contact Calvert several times after she quit, a claim that Calvert disputed in earlier stages of the proceeding.[47]

41. BPM at VL 210–1 (Oct.1999).

42. *Id.*

43. AS 23.20.385(b).

44. *Id.* at VL 150–2 (Nov.2010). The BPM also explains "if the time and expense of commuting is customary in the worker's occupation and locality, the worker generally does not have good cause." *Id.*

45. *Id.* at VL 210–1 (Oct.1999).

46. Calvert worked in the "gear" department, where she was responsible for ensuring that other employees' lab coats and other specialized clothing were cleaned daily and ready to be handed out at the start of the work day. This required her to get to Snug Harbor an hour before most employees started work to "start coffee and . . . make sure that there was enough gear to hand out and . . . everything was ready to go."

47. In her appeal to the Commissioner of the Department of Labor, Calvert argued that her phone bill did not reflect that she had received

■ An employer's limited authority or expressed refusal to accommodate an employee can establish that requesting an adjustment to work conditions would be futile: "[i]f the employer has already made it known that the matter will not be adjusted to the worker's satisfaction, or if the matter is one which is beyond the power of the employer to adjust, then the worker is not expected to perform a futile act."[48] That does not appear to be the situation here. King and Dale apparently had the authority to assign work hours and adjust employee schedules. Even taking into account the limited flexibility of hours in the gear department, giving Calvert more advance notice of her hours would have significantly mitigated her transportation problems; alternatively, her supervisors may have been able to transfer her to one of the other departments at Snug Harbor where she had worked in the past.

Moreover, neither King nor Dale (or any other Snug Harbor employee) had explicitly "made it known"[49] that they would not accommodate Calvert. Calvert's claim that her employers "did not talk to [her] when she brought problems to them" seems to refer to King's and Dale's failure to follow up on her inquiries about Mike cutting her hours. But as Calvert acknowledged to the Hearing Officer, she did not actually "ask [Dale] to do anything" to address her problems with Mike or the reduction in her hours, on the assumption that to do so would be "presumptuous." When the Hearing Officer asked if Calvert told "Richard [King], Paul [Dale] or Mike that if they didn't stop messing with [her]

hours, [she was] going to quit," Calvert said she had not. Nor did she ever raise the issue of her transportation difficulties. There is no indication that Calvert's inquiries about her hours were framed as complaints demanding a response, or that King and Dale would have ignored more direct requests for assistance. Although she reports general "hostility," Calvert presented no evidence beyond her own subjective belief to suggest that her employers' attitudes toward her would make them unwilling to help resolve her transportation problems had they known she was otherwise likely to quit.[50]

■ Calvert's claim that the Hearing Officer relied on "hearsay" to find that she had not exhausted her alternatives is also unconvincing. First, Calvert raised this argument for the first time in the superior court; we therefore consider it to have been waived.[51] Second, even if this argument had not been waived, the hearsay claim would be misplaced. Calvert did not object at the Appeal Tribunal hearing to Dale's testimony that King had reported attempting to call Calvert after she quit. "In the absence of a hearsay objection, hearsay evidence is competent evidence which may be considered."[52] Moreover, "[t]he strict rules of evidence governing admissibility of hearsay in judicial proceedings do not apply to administrative hearings, and [this court] will not reverse an administrative judgment based on hearsay unless the hearsay was inherently unreliable or jeopardized the fairness of the proceed-

any calls from King during the relevant period. And in her appeal to the superior court, she contended that "[t]he claim by employer of attempting to phone claimant four times is unsupported HEARSAY and there is a preponderance of credible evidence (my phone bill and written statements) in opposition to that claim."

**48.** BPM at VL 160–3 (Nov.2010).

**49.** *Id.*

**50.** At least one prior decision of the Commissioner of Labor has held that where an employer's actions established a "pattern of abuse and hostility" toward his employee, it would have been futile for the employee to confront the employer about his offensive behavior. *See* Decision of the Comm'r, Docket No. 98–0321, April 30, 1998. But the situation in Docket No. 98–0321 is distin-

guishable from the present case. There, the employer was the sole owner of the business, was verbally abusive, and had proven hostile to previous attempts by the employee to resolve other problems. Here, Calvert does not allege a relationship with her employers of such open hostility. She also had multiple levels of authority within Snug Harbor management from whom to seek assistance, and she does not appear to have been refused accommodation (upon direct request) on prior occasions.

**51.** *See, e.g., Wagner v. Stuckagain Heights*, 926 P.2d 456, 459 (Alaska 1996).

**52.** *Smith v. Sampson*, 816 P.2d 902, 907 (Alaska 1991).

ings."[53] Here, the admission of Dale's testimony does not appear to have "jeopardized the fairness" of Calvert's appeal proceedings. It is not clear from the Hearing Officer's decision that Dale's testimony was, in fact, used to lay a foundation for the viability of the proposed alternative. The Hearing Officer stated in her Finding of Facts that "[a]t no time did the claimant approach the supervisor and explain that the new work schedule created transportation issues for her.... [T]he employer made repeated attempts to contact [Calvert] in an attempt to discover why she had not returned." This context suggests that the Hearing Officer relied on Dale's testimony primarily in support of the general finding that Calvert never informed her employers of her transportation problems (a finding that is amply supported by other evidence in the record, including Calvert's own testimony), rather than as evidence of Dale's and King's willingness to accommodate Calvert.

We hold that there is substantial evidence in support of the Hearing Officer's finding that Calvert failed to exhaust all reasonable alternatives to quitting on the basis of transportation problems and therefore did not show good cause for leaving suitable work.

### 3. Calvert did not show good cause for leaving work on the basis of workplace hostility.

#### a. Calvert's personality conflicts did not provide a compelling reason to quit.

■■■■■ Under the BPM, dislike for a fellow employee may only be considered good cause for leaving work if "[t]he worker establishes that the actions of the fellow worker subjected the worker to abuse, endangered

the worker's health, or caused the employer to demand an unreasonable amount of work from the worker."[54] Mike's behavior toward Calvert did not endanger her health and, if anything, decreased the amount of work demanded of her (although with correspondingly decreased wages). Nor did it rise to the level of "abuse" as the Department has used the term in the past. Cases in which the Commissioner has found dislike of a fellow employee to be a compelling reason for quitting involve much more serious conflicts, such as threats of physical violence to the claimant.[55] To the extent that the change in Calvert's schedule motivated her decision to quit, it also did not constitute a compelling reason. "A change in [a] worker's hours, shifts, or days of work initiated by the employer is seldom a sufficient breach of the contract of hire to give a compelling reason to quit."[56] A reduction in hours is rarely considered compelling for purposes of establishing good cause: "a worker who leaves work merely because the work is less than full-time has voluntarily left work without good cause" and a "reduction in hours is not good cause for voluntarily leaving work" even where that reduction results in reduced earnings.[57]

#### b. Calvert did not exhaust all reasonable alternatives before leaving work due to personality conflicts.

■■■■ Even if the personality conflicts Calvert describes were to qualify as "abuse," she made only limited efforts to remedy the situation. As we have already noted, Calvert spoke to King and Dale about Mike reducing her hours but never directly asked either of them to address the issue or, as far as the

---

53. *Button v. Haines Borough,* 208 P.3d 194, 201 (Alaska 2009) (internal quotation marks and citations omitted).

54. BPM at VL 515.4–1 (Nov.2009). The worker must also "present[] the grievance to the employer and allow[] the employer an opportunity to adjust the situation." *Id.* This requirement is addressed below.

55. *See, e.g.,* Decision of the Comm'r, Docket No. 95–1484, August 1, 1995 (implying that verbal threats by a fellow employee gave worker "adequate reason" for leaving work, though still find-

ing an absence of good cause based on the worker's failure to attempt to remedy the situation); Appeal Tribunal Decision, Docket No. 98–0392, March 20, 1998 (finding that a worker had good cause to quit after a fellow employee threatened to get in a gun fight with him, and the worker reported the incident to his employer).

56. BPM at VL 450.05–5 (Nov.2009).

57. *Id.* at VL 450.4–1 (Nov.2009) (noting that a worker whose hours are reduced to part-time "is able to seek other work without leaving the existing employment").

record indicates, described the full extent of her conflicts with Mike. By her own admission, Calvert never explicitly sought a remedy for her problem. She contended that Dale and King "should have known ... what [she] was saying to them without [her] having to challenge them to do something about [her] problem." But without more information about precisely what Calvert said to her supervisors, there was little basis for a finding that they should have guessed or intuited what Calvert failed to articulate. Calvert was required to take more active steps to exhaust her alternatives before quitting; because she failed to do so, we agree with the Hearing Officer that she did not show good cause for leaving work on the basis of personality conflicts.

### D. Calvert Received A Fair Hearing.

Calvert makes a number of arguments relating to the procedural adequacy of her administrative hearing. We review these arguments de novo.[58] We note at the outset that Calvert has waived a number of her due process arguments by not raising them earlier in the appeals process. For example, she argues that the Hearing Officer "[n]eglected the fair hearing principle of discovery to claimant by employer" and "declined to obtain discovery from the employer, disregarding claimant's request for it." She also contends that "[d]ue [p]rocess requires notice of evidence to be used against claimant and an appropriate amount of time to develop a challenge and answer to any information from any source" and claims that she did not have sufficient notice of the evidence to be presented at the Appeal Tribunal hearing. Because these arguments were raised for the first time in Calvert's appeal to the superior court, rather than in her initial post hearing appeal to the Commissioner, we consider

them waived.[59] Similarly, Calvert's argument that the Hearing Officer improperly admitted hearsay evidence is waived because she raised it for the first time on appeal to the superior court.

#### 1. Calvert did not demonstrate actual bias by the Hearing Officer.

Calvert alleges that the hearing was biased, claiming that "[t]he hearing officer picked what she wanted out of the evidence and used it to try to prove her point" and that "[t]he reasonings and conclusions of the Tribunal were not fairly and impartially supported by the record." But as the Department notes in its brief, administrative officers are "presumed to be honest and impartial until a party shows actual bias or prejudgment."[60] To show the bias of a hearing officer, a party must demonstrate that the hearing officer "had a predisposition to find against a party or that the hearing officer interfered with the orderly presentation of the evidence."[61] This is a demanding standard. The United States Supreme Court has found a "probability of actual bias ... too high to be constitutionally tolerable" in cases where "the adjudicator has a pecuniary interest in the outcome" or "has been the target of personal abuse or criticism from the party before him,"[62] but not where a decisionmaker merely performs combined investigative and adjudicative functions.[63] Similarly, we have held that a hearing officer's failure to disclose his position as an AFL–CIO president during a worker's compensation hearing was insufficient to show actual or probable bias.[64]

Calvert has not presented any evidence that the Hearing Officer was predisposed to find against her. The assertion that the

**58.** *Smith v. Sampson,* 816 P.2d 902, 904 (Alaska 1991); *see also Childs v. Kalgin Island Lodge,* 779 P.2d 310 (Alaska 1989).

**59.** *See, e.g., Wagner v. Stuckagain Heights,* 926 P.2d 456, 459 (Alaska 1996).

**60.** *AT & T Alascom v. Orchitt,* 161 P.3d 1232, 1246 (Alaska 2007) (citing *Bruner v. Petersen,* 944 P.2d 43, 49 (Alaska 1997)); *see also Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

**61.** *AT & T Alascom,* 161 P.3d at 1246 (citing *Tachick Freight Lines, Inc. v. State, Dep't of Labor, Emp't Sec. Div.,* 773 P.2d 451, 452 (Alaska 1989)).

**62.** *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456.

**63.** *Id.* at 58, 95 S.Ct. 1456.

**64.** *AT & T Alascom,* 161 P.3d at 1246.

Hearing Officer selected evidence to support her findings is insufficient to show actual bias. Nor does the hearing transcript suggest that the Hearing Officer interfered in any way with the presentation of evidence. The Hearing Officer's questions were thorough and objective; the only evidence she excluded was related to Calvert's efforts to find work after quitting at Snug Harbor, an issue irrelevant to the question of whether Calvert quit suitable work with good cause. Calvert failed to demonstrate bias sufficient to overcome the presumption of the Hearing Officer's impartiality.

### 2. The superior court did not improperly reweigh evidence.

 In applying the substantial evidence test to review an administrative determination, a reviewing court may not reweigh evidence.[65] Calvert argues that "[t]he Superior Court erred when it improperly reweighed evidence concerning transportation: Transportation problems DID present insurmountable difficulties.... This would affect the issue of suitable work." Though the meaning of this argument is somewhat unclear, Calvert seems to be referring to the superior court's conclusion that, notwithstanding Calvert's expressed concerns regarding transportation (among other issues), "the record does not support a finding that the work at Snug was unsuitable." But this statement does not suggest that the superior court "reweighed" evidence. The superior court clearly indicated that its conclusion regarding suitability was based on the record created by the Hearing Officer. And although the Hearing Officer did not explicitly address the question of suitability, her factual findings provide sufficient evidence to support the conclusion that Calvert's work was suitable. The superior court presumably relied on the Hearing Officer's findings for its conclusion that "there is no evidence that the work was inconsistent with Calvert's physical capability, training, experience, earning ca-

pacity, or skill" and that the work was therefore suitable; this did not constitute a reweighing of the evidence.

### E. The Department Of Labor Did Not Fail To Inform Calvert Regarding Eligibility For Unemployment Insurance Benefits.

Calvert argues that "[t]he Department of Labor & Workforce Development neglected [its] duty" by failing to "inform the public or claimant adequately concerning its requirements for separation from employment regarding eligibility for full benefits before separation takes place." This argument reiterates Calvert's claim in her brief to the Appeal Tribunal that "[t]he DOL neglects to make known its presence [and] expectations ... regarding [unemployment insurance] benefits"[66] and that, although "[a] reasonably prudent person would believe they had been completely informed by orientation, handbook, practices, and notices posted," the materials distributed to new employees do not in fact provide sufficient information on unemployment insurance eligibility.

 To the extent Calvert is arguing that she lacked access to the policies governing unemployment benefits eligibility, we find her argument unconvincing. The Department's Wage and Hour Information brochure, which Calvert submitted as an exhibit in her appeal to the Commissioner, includes detailed information about the relevant statutes and regulations as well as directions for accessing past unemployment insurance appeals decisions online and reviewing the BPM at Department offices. And as the Department notes, the BPM is also available online. The "Voluntary Leaving Statement" that Calvert filled out and submitted after she filed for unemployment benefits gives notice to claimants that they must show "reasons for quitting ... so compelling" as to leave "no reasonable alternative." The Hearing Officer also explained the eligibility requirements to Calvert at the start of the

---

**65.** *Bollerud v. State, Dep't of Pub. Safety,* 929 P.2d 1283, 1286 (Alaska 1997).

**66.** Similarly, in her brief on appeal to the superior court, Calvert contended that she "was never properly warned or informed by the employer or

DOL that her OWN judgments regarding good cause for leaving work ... was not the standard for which she could voluntarily quit her job and still be eligible for [unemployment insurance] benefits."

Appeal Tribunal hearing. As a result, Calvert had notice of the Department's basic eligibility requirements and directions for accessing additional information, both prior to her Appeal Tribunal Hearing and throughout the appeals process.

 To the extent Calvert contends that the Department had a duty to inform her, while she was working, of how she might quit her job and maintain her eligibility for unemployment benefits, we find this argument equally unavailing. We have held that "[a]s a general rule, people are presumed to know the law" without being specifically informed of it.[67] The United States Supreme Court has required explicit notice of hearing procedures only where "the administrative procedures at issue were not described in any publicly available document." [68]

All of the statutes, regulations, and internal policy documents governing eligibility for unemployment insurance benefits are "publicly available documents" that are easily accessible and identified in Department-published materials, such as the Wage and Hour Information brochure and the unemployment insurance section of the Department's website.[69] Workers may be presumed to be familiar with the provisions of those documents. In this case, Calvert has not demonstrated that any circumstance prevented her from informing herself about the Department's eligibility requirements before she left work. The Department did not neglect a legal duty or deny Calvert due process by not informing her of its policies more directly.

## V. CONCLUSION

We AFFIRM the decision of the superior court. Calvert did not demonstrate good cause for leaving suitable work voluntarily.

---

**67.** *Hutton v. Realty Executives, Inc.,* 14 P.3d 977, 980 (Alaska 2000) (citing *Ferrell v. Baxter,* 484 P.2d 250, 265 (Alaska 1971)).

**68.** *City of W. Covina v. Perkins,* 525 U.S. 234, 241–42, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999) (distinguishing *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), from *West Covina,* because the state law remedies at issue in *West Covina* were "established by published, generally available state statutes and case law").

**69.** *See* http://labor.state.ak.us/esd_ unemployment_insurance/home.htm.